# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>(2) One white and black Garmin GPSMAP<br>Serial Number 7AN002549 | )<br>)<br>)  Case No. '23 MJ0001<br>)<br>)<br>) |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, incorporated herein by reference.

located in the ___Southern___ District of ___California___ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324; 18 USC 111, 113, 2237 | Bringing In Certain Aliens to the United States; Assault on a Federal Officer; Assault Within Special Maritime and Territorial Jurisdiction; Failure to Heave To |

The application is based on these facts:
See Attached Affidavit by HSI TFO Zachary B. Sharp, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Zachary Sharp*
Applicant's signature

Zachary B. Sharp, HSI TFO
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: January 4, 2023

*Daniel E. Butcher*
Judge's signature

City and state: San Diego, California    Hon. Daniel E. Butcher, United States Magistrate Judge
*Printed name and title*

# ATTACHMENT A-2

## PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of 8 U.S.C. § 1324(a)(2)(B)(ii); 8 U.S.C. § 1324(a)(2)(B)(iii); 18 U.S.C. § 111(a)(1)(b); 18 U.S.C. § 113(a)(2); and 18 U.S.C. § 2237 is described below:

(2) One white and black Garmin GPSMAP
Serial Number 7AN002549



Currently in the possession of Homeland Security Investigations, located at 185 W F Street, San Diego, California.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the electronic devices described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the electronic devices. The seizure and search of the electronic devices will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the electronic devices will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data:

a. tending to indicate efforts to commit violations of 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Certain Aliens for Financial Gain; 8 U.S.C. § 1324(a)(2)(B)(iii) – Bringing in Certain Aliens Without Presentation; 18 U.S.C. § 111(a)(1)(b) – Assault on a Federal Officer; 18 U.S.C. § 113(a)(2) – Assault Within Special Maritime and Territorial Jurisdiction; and 18 U.S.C. § 2237 – Failure to Heave To (collectively, the "Target Offenses");

b. tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to commit the Target Offenses;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to commit the Target Offenses;

d. tending to identify travel to or presence at locations involved in efforts to commit the Target Offenses;

e. tending to identify the user of, or persons with control over or access to, the subject device; or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above;

**which are evidence of violations of 8 U.S.C. § 1324(a)(2)(B)(ii); 8 U.S.C. § 1324(a)(2)(B)(iii); 18 U.S.C. § 111(a)(1)(b); 18 U.S.C. § 113(a)(2); and 18 U.S.C. § 2237.**

# AFFIDAVIT

I, Zachary B. Sharp, Agent with United States Border Patrol ("USBP") and Task Force Officer with Homeland Security Investigations ("HSI"), having been duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of an alien smuggling investigation conducted by HSI and the USBP for the following target property seized during the arrest of Jesus Jeovanny ALCARAZ-Valdez on December 17, 2022:

    (1)    One blue Xiaomi Redmi cellular phone
             Model No. M2101K7BL
             ("Target Device 1")

    (2)    One white and black Garmin GPSMAP
             Serial Number 7AN002549
             ("Target Device 2")

(collectively, the "Target Devices").

2. The Target Devices were seized from ALCARAZ on December 17, 2022, after being arrested on suspicions of alien smuggling, assault of a federal officer, assault in the special maritime jurisdiction of the United States, and failure to heave to. ALCARAZ's arrest stems from a maritime alien smuggling event in the Southern District of California.

3. It is believed that Target Device 1 was used to communicate with co-conspirators leading up to ALCARAZ's arrest and that evidence regarding the smuggling event, including GPS location data, is contained on Target Device 2. Probable cause exists to believe that the Target Devices contain evidence relating to violations of 8 U.S.C. § 1324(a)(2)(B)(ii); 8 U.S.C. § 1324(a)(2)(B)(iii); 18 U.S.C. § 111(a)(1)(b); 18 U.S.C. § 113(a)(2); and 18 U.S.C. § 2237.

4. The Target Devices are currently in possession of Homeland Security Investigations in San Diego, California. Because this affidavit is submitted for the

limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

5. Based upon my training and experience, and all the facts and opinions set forth in this affidavit, I submit this affidavit in support of the application to search the Target Telephones for, and to seize, as they pertain to violations of 8 U.S.C. § 1324(a)(2)(B)(ii) – Bringing in Certain Aliens for Financial Gain; 8 U.S.C. § 1324(a)(2)(B)(iii) – Bringing in Certain Aliens Without Presentation; 18 U.S.C. § 111(a)(1)(b) – Assault on a Federal Officer; 18 U.S.C. § 113(a)(2) – Assault Within Special Maritime and Territorial Jurisdiction; and 18 U.S.C. § 2237 – Failure to Heave To (collectively, the "Target Offenses"), all communications, records, or data including but not limited to emails, text messages, photographs, audio files, videos, or location data:

    a. tending to indicate efforts to commit the Target Offenses;

    b. tending to identify other facilities, storage devices, or services – such as e-mail addresses, IP addresses, phone numbers – that may contain electronic evidence regarding efforts to commit the Target Offenses;

    c. tending to identify co-conspirators, criminal associates, or others involved in efforts to commit the Target Offenses;

    d. tending to identify travel to or presence at locations involved in efforts to commit the Target Offenses;

    e. tending to identify the user of, or persons with control over or access to, the subject device; or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data above.

## EXPERIENCE AND TRAINING

6. I have been a Border Patrol Agent ("BPA") with the USBP since

November 19, 2009. I am a graduate of the USBP Training Academy in Artesia, New Mexico. As a result of my training and experience as a BPA, I am familiar with federal criminal and immigration laws. My primary duties have been the enforcement of federal immigration and drug trafficking laws under Titles 8, 18 and 21 of United States Code. As part of this training, I attended criminal investigation training that included course studies in, among other things, criminal law, constitutional law, search and seizures, and courtroom procedure.

7.     As a BPA, I am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to request issuance of federal search and seizure warrants. As an Agent with the Border Patrol, I investigate violations of Immigration and Nationality laws (Title 8, United States Code), including alien smuggling in violation of Title 8, United States Code, Section 1324, and related offenses.

8.     Since 2016 I have been a Border Patrol Agent – Intelligence ("BPA-I").  During my tenure as a BPA-I, I have observed and recorded many movements of individuals illegally entering the United States and of those suspected of smuggling illegal aliens into the United States, on land and by sea. I have interviewed defendants and witnesses related to their illegal entry and alien smuggling. I have been called upon to conduct these interviews. Through my observations and these interviews, I have gained a working knowledge and insight into the operational habits of aliens without legal status and alien smugglers, with particular emphasis on those who attempt to illegally enter or smuggle aliens without legal status into the United States from Mexico. I have participated in the investigations of criminal smuggling organizations, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants and the indictments of persons for alien and narcotics smuggling including drivers, narcotic distributers, foot guides, load house operators, and boat captains.

9.  Since January 2022, I have been a TFO with the HSI-led Martine Task Force ("MTF").  During that time, I have investigated maritime narcotics and alien smuggling events that occur within the Southern District of California.  This has included instances where maritime vessels, such as go-fast vessels and boats, are used to smuggle contraband and undocumented aliens into the United States.  Through my work with MTF and the USBP, I have learned about how alien smuggling organizations smuggle individuals and contraband from the littorals of Mexico to the United States illegally.

10. Based on my training, experience, and information provided to me by other agents from federal, state and local law enforcement agencies, I am familiar with the methods utilized in alien smuggling operations. Through the course of my career, I have arrested and interviewed numerous alien smugglers. Through these experiences, I have become familiar with the activities of those who coordinate maritime smuggling events and the practices used for the drivers/smugglers they employ locally and abroad, including transportation methods and tactics used to communicate with the drivers and avoid detection by law enforcement. I am aware that it is common practice for smugglers to work in concert utilizing cellular telephones. With respect to the importation of illegal aliens in this manner, I am aware that smugglers in Mexico frequently communicate with the individual responsible for importing the illegal aliens into the United States.  These communications can occur before, during and after the illegal aliens are brought into the United States.  For example, prior to the importation, smugglers frequently communicate with the transporter(s) regarding arrangements and preparation for the importation.  When the importation is underway, smugglers frequently communicate with the transporter(s) to remotely monitor the progress of the alien smuggling, provide instructions, and warn accomplices about law enforcement activity.  When the illegal aliens have been brought into the United States, smugglers may communicate with the transporter(s) to provide further instructions regarding the

4

delivery of the illegal aliens to a destination within the United States

11. In preparing this affidavit, I have conferred with other agents and law enforcement personnel who are experienced in the area of narcotics investigations, and the opinions stated below are shared by them. Further, I have personal knowledge of the following facts, or have had them related to me by persons mentioned in this affidavit. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

12. Based upon my training and experience, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

    a. Alien smugglers and their co-conspirators will use cellular telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

    b. Alien smugglers and their co-conspirators will use cellular telephones and GPS devices because they are able to actively monitor the progress of maritime vessels while the conveyance is in transit.

    c. Alien smugglers and their co-conspirators and their accomplices will use cellular telephones and GPS device because they can easily arrange and/or determine what time the undocumented aliens will arrive at predetermined locations.

    d. Alien smugglers and their co-conspirators will use cellular telephones and GPS devices to direct boat captains, crewmembers and/or landside transporters to synchronize an exact drop off and/or pick up time of the undocumented aliens.

    e. Alien smugglers and their co-conspirators will use cellular telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

//

//

# FACTS SUPPORTING PROBABLE CAUSE

### A.     Maritime Alien Smuggling Event

13.     On December 17, 2022, at approximately 5:30 a.m., the United States Coast Guard ("USCG") Sector San Diego ("SSD") Joint Harbor Operations Center ("JHOC") observed a target of interest ("TOI") cross the Maritime Boundary Line ("MBL"), drop off an estimated 12 persons in the vicinity of the Hotel Del Coronado, Coronado, CA and return to sea on a southerly course. The Hotel Del Coronado and its surrounding beach and coastline, which are in the Southern District of California, are neither a designated port of entry nor locations designated by the Secretary of the Department of Homeland Security for entry into the United States.

14.     At approximately 5:40 a.m., the USGC SSD advised the crew of the 29' Coast Guard Response Boat Small-II vessel CG-29439 ("CG-29439") to be on the lookout for a TOI near Hotel Del Coronado that was suspected of completing a human smuggling drop-off minute before. JHOC had surveillance footage of a panga-style vessel dropping off individuals and returning to sea on a southernly course. CG-29439, already on routine patrol in the area, identified a lights-out, fast moving panga-style vessel located approximately one and a half nautical miles west of Silver Strand State Beach and approximately seven nautical miles north of the MBL, which is within the maritime waters of the United States. Neither CG-29439 nor the JHOC observed any other vessels in the area matching the pangas description. The USCG small boat maneuvered to intercept the panga. During this time the JHOC did not receive any other sensor hits of TOIs in the sector. Based on the time of day, location, and route of travel the JHOC suspected this panga to be used in the maritime smuggling event. This caused the JHOC to maintain video surveillance of the vessel until the CG-29439 could intercept the vessel.

15.     CG-29439 closed within 20 feet of the TOI, approximately two nautical miles west of Silver Strand State Beach, still within the maritime waters of the

United States. CG-29439 determined the TOI was a panga-style craft with one outboard engine and a single operator, later identified as defendant JESUS JEOVANNY ALCARAZ-VALDEZ, on board. The vessel appeared to be transporting multiple fuel barrels and large bags of unknown items. The USCG officers onboard CG-29439 attempted to compel ALCARAZ to heave-to using blue law enforcement lights, sirens, and verbal orders to stop over the loud-speaker in English and Spanish. ALCARAZ ignored the USCG's orders to heave-to and continued south at a high rate of speed (approximately 30-40 knots).

16. CG-29439 initiated a high-speed pursuit of the non-compliant vessel ("NCV") and expended two rounds of flash bangs. But ALCARAZ continued the panga on its southerly course toward Mexico at a high rate of speed despite warning shots to heave-to.

17. At this time, CG-29439 requested authorization to use disabling fire on the panga's outboard engine. As the USCG was processing that request, the panga briefly came down in speed due to running out of fuel. ALCARAZ attempted to switch fuel barrels as the crew of CG-29439 gave loud and clear commands to the operator to pull the kill switch and show his hands. ALCARAZ failed to comply, made sudden movements into various compartments and his personal bag, and restarted his vessel.

18. Once the vessel restarted, ALCARAZ made erratic maneuvers and twice rammed CG-29439 at a high rate of speed. The first ramming hit the CG-29439 in the middle of the ship. ALCARAZ's second attempt at ramming CG-29439 caused the forward starboard window to shatter into pieces and nearly hit the Coast Guard crewmembers positioned on the starboard side. The crew of CG-29439 consisted of four Federal law enforcement officers of the United States Coast Guard: J. Flora; A. Childs; J. Margaria; and A. Eeds.

19. Some of the damage caused to the USCG boat is shown in the pictures below, including of the shattered glass.

 

20.  Based on my training and experience, a motorized boat, such as the panga used by ALCARAZ, is a dangerous weapon because the use of a panga to ram another vessel makes it capable of causing death or serious bodily injury. *See, e.g., United States v. Ojeda Agundez*, Case No. 20CR2509-JLS (S.D. Cal.) (prosecution of defendant for assault on a federal officer where defendant rammed a USCG vessel and caused injury to officers).

21.  In assessing the panga as an imminent threat to the safety and security of CG-29439, the crew of CG-29439 expended two rounds into the panga's outboard engine and successfully disabled the panga in position approximately 4.3 nautical miles west of Imperial Beach Pier and north of the Maritime Boundary Line in United States territorial waters.

22.  With his engine disabled, ALCARAZ remained non-compliant to law enforcement commands and began to move around the panga, reaching into his bag and coat pockets. USCG boarding officers boarded the vessel, immediately detained ALCARAZ, and transitioned him to CG-29439 without injury. The crew of CG-

8

29439 subsequently placed the panga in side-tow and ALCARAZ and his panga were taken to the USCG moorings at Ballast Point. A USCG crewmember onboard CG-29439 identified Target Device 1 on ALCARAZ's person, within ALCARAZ's pocket, during a frisk search for officer safety. Target Device 2 was attached to the boat key used to keep the vessel's engine running. The Target Devices were both seized as evidence.

23. Meanwhile, United States Border Patrol agents assigned to the Imperial Beach Station apprehended eight undocumented aliens in vicinity of Hotel Del Coronado. On scene, Border Patrol agents assessed that four persons had absconded from the area. The investigation revealed that the panga had approximately 12 lifejackets of various sizes, seven fuel barrels, and no navigation lights.

24. Immigration checks revealed that all five of the individuals apprehended were citizens of Mexico, and three were citizens of Guatemala. Immigration checks further revealed that none of the eight individuals had authorization to enter or remain in the United States legally. The United States Border Patrol identified the eight adult migrants as: Samuel De Jesus HERNANDEZ-Mejia, Sindy Nataly LAPOYEU Ortega De Millan, Wilbert Bernardo PACHECO-Ordaz, Ofir ALVARADO-MEJIA, Milton CARDONA-RODAS, Luis CELIS-BUSTAMANTE, Victor Hugo JUAREZ-GASPAR, and Sergio MARTIN-ROMA.

<u>Material Witness Wilbert Bernardo PACHECO-Ordzaz</u>

Wilbert Bernardo PACHECO-Ordaz was interviewed by Border Patrol Agents. PACHECO-Ordaz stated that his true and correct name is Wilbert Bernardo PACHECO-Ordaz. PACHECO-Ordaz is a citizen of Mexico. PACHECO-Ordaz stated that he was born in Mexico City, Mexico. PACHECO-Ordaz stated that he had no legal immigration document that would allow him to enter or remain in the United States. Records check do not indicate that PACHECO-Ordaz has proper documentation to enter or remain in the United States. PACHECO-Ordaz stated that

9

the operator of the panga told the passengers to take off their life jackets in the vicinity of shore before being dropped off. PACHECO-Ordaz stated that he was going to be charged $20,000 dollars for his smuggling arrangements.

25. Based on my knowledge of this investigation, I believe that ALCARAZ was the captain and navigator of a go-fast vessel used to complete a maritime alien smuggling venture that began its voyage in Mexico. I believe ALCARAZ was transporting approximately 12 undocumented aliens, including the eight that were apprehended. I also believe that ALCARAZ coordinated the maritime smuggling event using the Target Devices. Specifically, I believe that ALCARAZ used Target Device 1 to communicate with co-conspirators. Moreover, I believe that ALCARAZ utilized Target Device 2 (GPS device) to navigate from Mexico into the territorial waters and ultimately to Coronado, where I believe ALCARAZ dropped off the aliens that were apprehended.

26. Based on my training and experience, I believe that the planning for a maritime smuggling event can take place over many months. In this case, some of the aliens had traveled from as far as Guatemala and from Mexico to reach the Baja California area. Moreover, agents believe that four undocumented aliens were not apprehended and may have successfully made it into the United States. The identities of those individuals are unknown. I believe that information that could help identify those individuals is reasonably likely to be contained in Target Device 1.

27. I also request to search the Target Devices without any date limitation for several reasons. First, a critical component of this investigation the identification and attribution evidence of the true user of the Target Devices. Information identifying the user of a cellphone or GPS device is relevant regardless of the date of that data. For example, records on a cellphone demonstrating prolonged use of a cellphone by a particular individual tends to indicate that individual is the user of the device. Moreover, GPS data showing where the vessel was docked and where it

traveled previously can help identify the user of the Target Device 2. This information is relevant irrespective of the date range of the data.

28. In addition, based on my training and experience and consultation with law enforcement officials familiar with the forensic extraction of cellphones, I know dates and times associated with certain files will often be well outside normal time limitations. For example, cellphones can contain files that are date-stamped January 1, 1970. This date predates the existence of cellphones. Based on open source research, I learned that January 1, 1970 00:00:00 is known as the Unix epoch time. Unix epoch time is a way of representing a timestamp by representing the time as the number of seconds since January 1, 1970 at 00:00:00 UTC. One of the primary benefits of using Unix epoch time is that it can be represented as an integer, which makes it easier to parse and use across different systems. Sometimes when metadata on a file is erased, the timestamp is zeroed out and thus will default January 1, 1970. If a search warrant limited is to a period, such the 6 months before an arrest, then files that may have been deleted, or whose metadata may have been programmatically (or manually) removed, may display the Unix epoch time as their timestamp. These dates would fall outside the warrant range.

29. Further, depending on the type of cellular phone, a phone can contain a log indicating the first time the user of the phone added and/or communicated with one of user's contacts. This information is relevant regardless of any time limitation because it can help establish the length of time two targets have been in contact or when they first became in contact.

30. Modern cellphones also often store financial information such as methods of payment. Many cellphone models, for example, have digital wallets that allows users to store credit cards and other payment methods. Payment methods may have date stamps associated to when they were added to a phone. By placing a time limitation, that information could get excluded from the forensic examination.

11

31. Likewise, increasingly I have seen users of cellular phones use app-based messaging services, such as WhatsApp, to communicate with one another. These messaging apps often have built-in emojis and other images that users can use to communicate to one another. In other words, these images can give context to communications. For example, a user may send a message saying that "12 chickens" are ready. Another user may simply respond with a thumbs-up emoji. In context, the thumbs-up image provides additional meaning to the conversation. Built-in images and icons, however, often have a date/time stamp that matches the installation date of a particular app, rather than its usage in a conversation. In a date-limited search, images and icons like the thumbs-up icon described above could be excluded from the search if the application associated with that image was installed outside the given date range, which naturally could remove crucial context from other pertinent communications.

32. In similar vein, in many instances when attachments, such as images or documents, are sent using messaging services, the attachments will retain the original date/time stamp of the file being sent. So for example, if an individual sends a photo from the internet that has a date stamp, that date stamp can carry over to the file saved on the cellphone. Once more, a date-limited search may exclude such information from the data.

33. Similarly, the search warrant being requested would allow agents to seize data "tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved" in the crimes being investigated. In many instances, individuals involved in drug trafficking or other criminal activity use coded language. By being able to look at a broader range of communications, rather than a narrow snapshot, I can make a more accurate assessment as to coded and veiled language used by the targets of this investigation. Once more, a date-limited search will artificially narrow that understanding by providing a more limited data set to evaluate coded language.

12

34.     For all of the foregoing reasons, I believe agents should be allowed to search the Target Devices without any specified date range.

## METHODOLOGY

35.     18.     It is not possible to determine, merely by knowing the cellular telephone or GPS/chartplotter device's make, model and serial number, the nature, and types of services to which the device is subscribed, and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

36.     19.     Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the cellular telephone and GPS/chartplotter/sonar devices and memory cards

will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

37.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.  The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

### CONCLUSION

38.     Based on all of the facts and circumstances described above, I believe that probable cause exists to conclude that ALCARAZ used the Target Devices and to facilitate the Target Offenses.  The Target Devices were likely used to facilitate the offenses by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of the Target Offenses.

39.     I also believe that probable cause exists to believe that evidence, fruits and instrumentalities of illegal activity committed by ALCARAZ and others continues to exist on the Target Devices.

//
//
//
//
//
//
//
//
//
//
//
//

14

40.     Based upon my training and experience, consultation with other agents in narcotics investigations, consultation with other sources of information, and the facts set forth herein, I know that the items to be seized set forth above in Paragraph 3 are likely to be found in the property to be searched described above in Paragraph 1.  Therefore, I respectfully request that the Court issue a warrant authorizing me, a Task Force Officer with HSI, or another law enforcement employee specially trained in digital evidence recovery, to search the items described in Attachments A-1 and A-2 and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Zachary Sharp*
_____
Zachary B. Sharp
Task Force Officer
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on January 4, 2023.

_____
Honorable Daniel E. Butcher
United States Magistrate Judge